2005-NMCA-118

120 P.3d 854

**Gertrude KAVENY and Leora Miners, Plaintiffs–Appellees,**

v.

**MDA ENTERPRISES, INC., d.b.a. Arnett Home Remodeling, and Mike Arnett, individually, and Randy Deubler, individually, Defendants–Appellants.**

No. 24,239.

Court of Appeals of New Mexico.

Aug. 15, 2005.

Alex Chisholm, Donald C. Clifford, Albuquerque, NM, for Appellees.

Keith S. Burn, Darci A. Carroll, Cuddy, Kennedy, Albetta & Ives, LLP, Santa Fe, NM, for Appellants.

*OPINION*

CASTILLO, Judge.

{1} Defendants MDA Enterprises, Inc., (MDA), d.b.a. Arnett Home Remodeling, and Mike Arnett (Arnett) appeal a district court judgment against them for fraud. Plaintiffs' claims against Randy Deubler were dismissed with prejudice, and he is not a party to this appeal. MDA and Arnett (Defendants) raise the following issues on appeal: (1) there was insufficient evidence to support the finding of fraud and the award of punitive damages against Defendants, (2) Arnett acted with corporate authority and does not have individual liability, and (3) the district court abused its discretion in awarding prejudgment interest on the punitive damages. We affirm the judgment against both Defendants with regard to fraud and the award of punitive damages, but we reverse the award of prejudgment interest on the punitive damages award.

## I. BACKGROUND

{2} Plaintiffs Leora Miners (Miners), age sixty-five, and her ninety-year-old mother, Gertrude Kaveny (Kaveny), contacted Deubler regarding the construction of a detached cottage, which was to be located in the rear of Miners' property and which was to serve as Kaveny's new home. The following facts derive from the record in this case. Deubler, as a disclosed agent for MDA, made a contract with Plaintiffs on October 6, 2000, for construction of the detached cottage. In that contract, MDA accepted responsibility for obtaining and paying for the project's building permit. A condition of the contract was that if a building permit could not be obtained from the City of Albuquerque (City), Plaintiffs would receive a full refund of all monies paid. At the time, Arnett was president of MDA. The parties stipulated that Arnett was not present at the signing of this first contract. Arnett was present at the October 9, 2000, meeting with Plaintiffs, where he showed them a draft plan for a detached cottage of approximately 1100 square feet, including two bedrooms, two baths, a kitchen, and a laundry. At this meeting, Arnett, Deubler, and Plaintiffs executed a second contract, which contained

more complete terms of the project. The parties stipulated that both contracts were in effect. Plaintiffs paid a total of $30,000 down on a total project cost of $100,000.

{3} On December 7, 2000, Arnett obtained a building permit for the project from the City, but the permit described the project as a "shop addition" valued at $19,061. Later in December, Plaintiffs instructed workmen to stop work on the project because of financial concerns regarding Plaintiffs' ability to pay for the remainder of the project. Although Plaintiffs were not aware that Arnett had not obtained a permit allowing the construction of a detached cottage, Plaintiffs had repeatedly asked to see copies of the permit and final drawings for the project, but Defendants failed to provide those documents. After stopping the project, Plaintiffs expected a full refund of their down payment, but MDA never returned any of that money. Plaintiffs then filed this suit.

{4} At trial, the district court found that Deubler was acting as an agent on behalf of MDA and that his actions bound MDA. Additionally, the district court found that Arnett's actions bound MDA and created individual liability for Arnett. Accordingly, the district court held for Plaintiffs on all of their theories: breach of contract, fraud, and unfair trade practices. The district court assessed compensatory and punitive damages under each theory. Plaintiffs elected to obtain their remedy through the fraud claim. The final judgment awarded Plaintiffs was $30,000 in compensatory damages and $45,000 in punitive damages against Defendants, jointly and severally. The district court also granted prejudgment interest on both the compensatory and the punitive damages. Additional pertinent facts are set out in our discussion of the issues below.

## II. DISCUSSION

{5} We first address Defendants' argument that there was insufficient evidence to support a judgment for fraud, then turn to the issues on individual liability, punitive damages, and prejudgment interest.

### A. Fraud

{6} Defendants contend that there is insufficient clear and convincing evidence in the record to support the district court's judgment that they committed fraud. In determining whether there is substantial evidence to support the district court's findings, we review the evidence in the light most favorable to upholding the finding and indulge all reasonable inferences in support of the district court's decision. *Robertson v. Carmel Builders Real Estate*, 2004–NMCA–056, ¶ 20, 135 N.M. 641, 92 P.3d 653. It is for the fact-finder, not the appellate court, to weigh the evidence. *Id.* ¶ 28. Viewing the evidence in this light, we are not persuaded by Defendants' arguments.

{7} Defendants' basic argument is that the evidence did not establish each of the elements of fraud. The essential elements required to prove fraud are (1) that a representation was made as a statement of fact, (2) that the representation was untrue and known to be untrue by the party making it or that it was recklessly made, (3) that the representation was made with intent to deceive and for the purpose of inducing the other party to act upon the representation, and (4) that the other party relied on the representation and was induced thereby to act to that party's injury or damage. *Sauter v. St. Michael's Coll.*, 70 N.M. 380, 384–85, 374 P.2d 134, 138 (1962). Specifically, Defendants argue that (1) they did not make a false representation to Plaintiffs, (2) Defendants did not knowingly make a false representation with the intent to deceive or induce Plaintiffs to rely on the representation, and (3) Plaintiffs did not rely on any representation made by Defendants and were not damaged.

{8} The district court found that there was clear and convincing evidence that MDA, through the actions of Deubler and Arnett, as well as Arnett in his individual capacity, made two misrepresentations to Plaintiffs: (1) that a detached two-bedroom, two-bath house with a kitchen and a laundry could be built on the property and (2) that Plaintiffs would receive a full refund if a permit could not be obtained. The record reflects, and the parties do not dispute, the

following facts: (1) Deubler was acting as an agent for MDA, and Arnett was president of MDA; (2) Deubler executed an initial contract with Plaintiffs to build a two-bedroom, two-bath detached house, with a kitchen and a laundry; (3) Arnett was aware of this contract, and both he and Deubler signed the second contract; (4) the contracts committed MDA to obtaining the proper permits for the project, and if those permits could not be obtained, Plaintiffs would receive a full refund; (5) Arnett did not repudiate any part of the contracts and, in fact, drew up the initial plans contained in the second contract; (6) the contracts specified that MDA accepted a relationship of trust and confidence between itself and Plaintiffs; and (7) Plaintiffs paid MDA $1,000 at the signing of the first contract and $29,000 after the signing of the second contract.

{9} Additionally, the district court found the following facts, which are supported by the testimony at trial and by the record proper: (1) Deubler and Arnett knew that time was of the essence on the project, given the age of Kaveny; (2) Deubler and Arnett knew that the area was zoned R–1 for single-family housing and that a detached house was not possible in that location; (3) the project began without a permit, and no permit was obtained for approximately two months; (4) prior to stopping the work, Plaintiffs asked to see the permit and plans for the project but were never shown these items by Defendants; (5) Arnett intentionally submitted a permit application for a shop addition, which was the incorrect type of permit; (6) a subsequent permit amendment was also improper for the contracted work; (7) after litigation ensued and to prove that a permit was possible, Arnett applied for the correct permit, but it was for an addition connected by a walkway to the main house, rather than for a detached cottage; and (8) a connected addition was never discussed with Plaintiffs.

{10} Defendants argue that there were no misrepresentations and contend that the City ultimately issued a permit in February 2002 for an addition that did not differ materially from the cottage that MDA contracted to build. Further, Defendants assert that if the City had not given a permit and if Plaintiffs had not stopped work on the project, a full refund would have been given to Plaintiffs. Defendants claim that Plaintiffs stopped the project before the triggering event—i.e., failure to get the proper permit—so no refund was required. We are not persuaded.

{11} Given the evidence described above, it is clear that Defendants knew the property was zoned R–1, which meant that by law, the separate dwelling they had contracted to build for Plaintiffs could not actually be built on Miners' property. Thus, the record supports the district court's conclusion that Defendants' first statement—that a detached house could be built—was a misrepresentation of fact.

{12} Defendants' second contention—that a refund would have been forthcoming had a permit not been issued—is not supported by the record. To the contrary, the evidence shows that Defendants manipulated the permitting process to avoid this eventuality by applying for a shop-addition permit, which they knew would be granted. Defendants kept Plaintiffs' money throughout the permitting process and had not returned any of it by the time of trial. This constitutes sufficient evidence that the second statement was a misrepresentation.

{13} Defendants' remaining arguments point to conflicting testimony or discrete findings of fact, and Defendants fail to develop any argument on these points. It appears that Defendants are asking this Court to reweigh the evidence, which we will not do. *Sanchez v. Saylor*, 2000–NMCA–099, ¶ 12, 129 N.M. 742, 13 P.3d 960 (observing that an appellate court will not reweigh evidence or substitute its own judgment for that of the trier of fact). The record reflects sufficient evidence for the district court to have found that Defendants made fraudulent misrepresentations to Plaintiffs.

{14} The district court also found that these misrepresentations were willful and given with the intent to deceive or induce Plaintiffs to engage in the contract or, at least, were given with reckless disregard of Plaintiffs' rights. Defendants argue that they did not know that the representations were untrue and that they had no intent to

deceive Plaintiffs or induce Plaintiffs to act on those representations. However, the argument presented by Defendants contains no evidence or precedent concerning their intent or knowledge. Their sole argument appears to be that because Plaintiffs never knew an appropriate permit had not been obtained for the work, there was no deception or inducement to enter into the contract. Additionally, Defendants contend that Plaintiffs only stopped work because of their financial concerns, not because of Defendants' representations. Defendants fail to understand that, as the district court found, their fraud occurred before Plaintiffs stopped work on the project. The misrepresentations occurred at the time the contract was created; therefore, what Plaintiffs knew about subsequent permitting activities and why Plaintiffs ultimately stopped the project are irrelevant.

{15} As described above, Defendants knew that the property was zoned R–1 at the time the contracts were written for a detached cottage. Thus, the district court could infer that at the time the parties entered into contract, Defendants were aware that it would be impossible to construct a detached cottage. From this intentional misrepresentation, along with the collection of a $30,000 down payment and a promise to return the money if a permit could not be obtained, the court could infer that the misrepresentations were stated for the purpose of inducing Plaintiffs to sign the contract and tender the money. Additionally, given the testimony that Plaintiffs asked to see the final plans and permit for the project and that Defendants failed to provide this information, the district court could interpret Defendants' lack of response to be an intentional concealment of the fraudulent nature of the contract. It is also important to note that the district court found that the testimony offered by Deubler and Arnett was not credible. We are satisfied that the record reflects that Defendants knew the statements were false and made the statements with the intent to induce Plaintiffs to sign the contracts and put a down payment on the project.

{16} Lastly, the district court found that Plaintiffs relied on these misrepresentations and were consequently damaged by them.

Defendants conversely assert that Plaintiffs did not rely on any of the representations and were not damaged. Again, the basis of Defendants' argument is that since Plaintiffs did not know about the property restrictions or the nature of the permits that were obtained, they could not have relied on Defendants' statements. Further, they contend that the fraudulent misrepresentations were made to the City and not to Plaintiffs.

{17} Plaintiffs testified that they relied on Defendants' representations that a detached cottage could be built or their money would be refunded and that these representations induced them to enter into the contract and provide payment. Their reliance is evident from their signing the contract and paying $30,000 down on the project. Plaintiffs' damage was the loss of the $30,000.

{18} Thus, after review of the record, we find that there was substantial clear and convincing evidence for the district court to find that Defendants committed the intentional tort of fraud through their misrepresentations to Plaintiffs.

### B. Individual Liability of Arnett

{19} The district court found Arnett individually liable for the tort of fraud. Arnett argues that he acted, at all times, with corporate authority and does not have any individual liability to Plaintiffs. He contends that to impose such liability, Plaintiffs must pierce the corporate veil. Further, he asserts that Plaintiffs failed to plead such a cause of action and that there were no findings or conclusions to support such extraordinary relief. Conversely, Plaintiffs maintain that piercing the corporate veil was not required in this case and that there was sufficient evidence to find Arnett individually liable. We agree with Plaintiffs that it was not necessary to pierce the corporate veil to hold Arnett individually liable under the facts of this case.

{20} Officers of corporations can be held personally liable when they commit intentional torts. *Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 437, 872 P.2d 852, 855 (1994), *limited on other grounds, Kropinak v. ARA Health Servs.,*

*Inc.,* 2001–NMCA–081, ¶¶ 12–14, 131 N.M. 128, 33 P.3d 679; *see also Stinson v. Berry,* 1997–NMCA–076, ¶ 18, 123 N.M. 482, 943 P.2d 129 (holding that directors engaging in tortious conduct may be held liable, even if they are acting within the scope of corporate duties); *Kreischer v. Armijo,* 118 N.M. 671, 673, 884 P.2d 827, 829 (Ct.App.1994) (acknowledging that an "agent may be held individually liable for his [or her] own tortious acts, whether or not he [or she] was acting for a disclosed principal"). Here, as described above, there was sufficient evidence to find that Arnett, as an individual, committed the intentional tort of fraud.

{21} Under Restatement (Second) of Agency § 348 (1958),

> [a]n agent who fraudulently makes representations, uses duress, or knowingly assists in the commission of tortious fraud or duress by his principal or by others is subject to liability in tort to the injured person although the fraud or duress occurs in a transaction on behalf of the principal.

Thus, once the district court found that Arnett committed the intentional tort of fraud, it was unnecessary to pierce the corporate veil to hold him individually liable. *See Duval County Ranch Co. v. Wooldridge,* 674 S.W.2d 332, 337 (Tex.Ct.App.1984) (holding that corporate officers are liable for their own fraudulent acts, even when they are acting for the benefit of the corporation); *see also Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 606 (3d Cir.1978) (stating that "[a] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort"); *Lobato v. Pay Less Drug Stores, Inc.,* 261 F.2d 406, 408–09 (10th Cir.1958) (observing that as a general rule, "if an officer or agent of a corporation directs or participates actively in the commission of a tortious act ..., he is personally liable to a third person for injuries proximately resulting therefrom").

{22} Arnett additionally argues that under *Kreischer,* we must look to whether the gravamen of the complaint lies in contract or tort. Arnett contends that Plaintiffs' cause of action arises out of contract and that such contractual obligations do not impose liability on him individually. Further, Arnett maintains that Plaintiffs must demonstrate he had a duty to them that created individual liability if breached. He cites to *Stinson* for the proposition that duty must be found.

{23} *Kreischer* is distinguishable from the present case. In *Kreischer,* this Court reviewed a summary judgment decision by the lower court; whereas, here, we review a district court decision finding that Arnett committed an intentional tort. *Kreischer,* 118 N.M. at 672–73, 884 P.2d at 828–29. In *Kreischer,* the key issue was whether the allegations sounded in tort or in contract. *Id.* at 673–74, 884 P.2d at 829–30. In the present case, the district court found that the tort allegations were meritorious. We also noted in *Kreischer* that under some circumstances, allegations of a noncontractual nature could support a claim that was separately actionable against an individual. *Id.* at 674, 884 P.2d at 830. Such is the case here, where we find sufficient evidence in the record to support the judgment of fraud against Arnett.

{24} Similarly, Arnett's reliance on *Stinson* is misplaced. In *Stinson,* we remanded for the district court to determine whether the defendant had a duty to the plaintiff; however, that case dealt with negligence, in which duty is a necessary element of the tort. *Stinson,* 1997–NMCA–076, ¶¶ 6–7, 20, 24, 123 N.M. 482, 943 P.2d 129. The tort of fraud has no such component. *See* UJI 13–1633 NMRA.

{25} Thus, we are unpersuaded by Arnett's arguments, and we uphold the district court's judgment against Arnett individually.

## C. Punitive Damages

{26} The district court awarded punitive damages against Defendants, which they appeal on the ground that there was insufficient evidence to support such an award. On appeal, we review for substantial evidence the district court's findings underlying an award of punitive damages. *Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.,* 2001–NMCA–082, ¶ 36, 131 N.M. 100, 33 P.3d 651. "Substantial evidence is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

{27} The district court found that "MDA and Arnett's actions in failing timely to apply for a permit and then applying for a patently inapplicable permit evince their knowledge that a permit could not be given for the project as contracted for and a conscious intent to deceive Plaintiffs." Defendants maintain that there was insufficient evidence of Defendants' culpable mental state. In support, Defendants recite several findings of fact that ostensibly contradict the conclusion that they acted with the requisite mental state. These findings of fact address issues that include the following: how much Plaintiffs may have known about the possibility of obtaining an appropriate permit, the fact that the City eventually approved a permit for an attached addition, and Defendants' contention that any misrepresentations Defendants made were to the City and not to Plaintiffs. It is not clear how these findings of fact support Defendants' assertion because they do not address Defendants' mental state.

{28} A defendant had a "culpable state of mind when the evidence shows that the defendant acted with reckless disregard for the rights of the plaintiff or that the defendant knew that its actions could harm the interests of the plaintiff but failed to exercise care to avoid such harm." *Id.* ¶ 37. "To be liable for punitive damages, a wrongdoer must have some culpable mental state, and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level[.]" *Clay v. Ferrell-gas, Inc.,* 118 N.M. 266, 269, 881 P.2d 11, 14 (1994) (citation omitted). Here, as discussed above, the record indicates that MDA, through the action of its agents Deubler and Arnett, as well as the action of Arnett individually, knew that a detached structure could not be permitted in an R–1 zoned area. At that same time, they asked for and received $30,000 from Plaintiffs to begin a project that Defendants knew could not be permitted as specified in the contract. Plaintiffs in this case were two women, ages sixty-five and ninety, who were attempting to build quickly a cottage so that the daughter could take care of her ailing mother. While Defen-

dants argue that the City ultimately permitted a substantially similar dwelling, we agree with the district court that the permitting issue was a material fact that Defendants were under an obligation to disclose at the outset of the project. Defendants' conduct rose, at least, to the level of being reckless or fraudulent, and the record, as described above, contains sufficient evidence to support the district court's findings of fact that relate to punitive damages.

### D. Prejudgment Interest

{29} Lastly, Defendants argue that the district court's decision to award prejudgment interest on the punitive damages award was an abuse of discretion, and Plaintiffs agree to abandon this award. Defendants are correct that this Court has held that punitive damages awards are not subject to prejudgment interest. *Weidler v. Big J Enters., Inc.,* 1998–NMCA–021, ¶¶ 52–55, 124 N.M. 591, 953 P.2d 1089. The record indicates that while the district court discussed prejudgment interest as to the compensatory award only, the final judgment and order calculated it on both the compensatory and the punitive awards. Therefore, as a matter of law, we reverse the district court's award of prejudgment interest on the punitive damages.

### III. CONCLUSION

{30} For the foregoing reasons, we affirm the district court's judgment against Defendants for fraud and uphold the punitive damages award. However, we reverse the district court's granting of prejudgment interest on the punitive damages award.

{31} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and RODERICK T. KENNEDY, Judges.